Hitchcock, J.
From an examination of the indictment, in this case, we incline to the opinion that the first four counts are defective, but if there be one good count in an indictment, and the verdict is general, such good count is sufficient to authorize the court to pass sentence, or enter .up judgment. The fifth and sixth counts in this indictment are similar to the indictment in the case of Lougee v. State of Ohio, decided at the present term, and which, after full consideration, was held by the court to be sufficient.
Before proceeding to examine the ease, as presented in the bill of exceptions, it is necessary to ascertain, definitely, what was requested, by the defendant, of the court, in charging the jury, and what were the instructions actually given.
The first instructions requested, were, that the jury must take 'the intention into consideration, and if there was no intention to ¡do a banking business, the defendant could not be found guilty.
The court, instead of giving such instructions, directed the jury, in substance, that an intention to accomplish a good object, ¡by an issue of unauthorized bank paper, would not excuse such an issue. If the act done was illegal, the motive leading to the commission of such illegal act could not excuse its commission. In other words, that in law, at least, the end will not justify the means.
*In the second place, the defendant requested the court to charge the jury ¡that, if the notes were not in a negotiable form when they left the control of the company, but were afterward negotiated without the previous consent of the company, the defendant could not be found guilty. The charge which followed, upon this request, is somewhat confused, but, upon careful examination, seems, .in substance, to have been that if the jury was sat *67 isfied, from the evidence, that the Whitewater Canal Company, not being authorized by law so to do, had issued and put in circulation unauthorized bank paper, the individuals constituting the company could not be protected, by their act of incorporation, from the legal consequences resulting from such issue; and that, if the jury believed that the bills, notes, or paper issued by said company,, as evidences of debt, were in the similitude of ordinary bank paper or bills, and were designed, calculated, and intended to circulate as money, and pass by delivery, by those who made and paid them out, and that shifts and devices were resorted to, in the appearance of the paper as well as in its form, to obtain for it a circulation as money, the paper thus issued would be unauthorized bank paper. And an association of individuals putting such paper in circulation would be guilty of a violation of the. law, although the same was not payable to bearer, or indorsed in blank, when it left the control of the association.
The inquiry is, whether there was anything wrong in the instructions given, or in refusing the instructions requested. This will lead us to an examination of the law, for a violation of which the plaintiff in error was convicted. And, in order to give a proper construction of this law, it will be necessary to inquire into the cause of its enactment, as well as of the mischiefs which it was intended to remedy.
. Previous to the declaration of war, in 1812, but six banks had been incorporated in the State of Ohio, and were in operation. These banks had been found to be, or, at any rate, were supposed to be by the people of that day, institutions beneficial to the interests of the state. Their credit was good, and their paper equivalent to specie. Shortly after the declaration *of war, these banks, as well as all others west and south of New .England, were compelled to suspend specie payments. This suspension was, for the time being at least, winked at by the government. Still, the people had confidence in the banks, and their paper furnished the entire circulating medium; and it is a fact worthy of remembrance that the paper of these institutions, although much depreciated, was held to be more valuable than the paper issued by the government itself. Treasury notes issued by the government of the United States were, in the market, as much below the value of these depreciated bank notes as the bank notes were below the value of specie. In such notes the taxes to the states and to the *68 United States were paid, and in such notes were loans made to the government. Without them, the war could not have been prosecuted, and the government must have become bankrupt. But, in consequence of being relieved from the payment of specie, the banks were less cautious as to the amount of paper issued, and there is reason to believe that the business was profitable; at least it was so considered, and many associations were formed without the authority of law, and, as was believed, some of thorn without capital, for the purpose of transacting banking business. At this state of things the reflecting people of the state became alarmed, and on February 8, 1815, the first law was passed in the State of Ohio restraining individuals and associations from banking. Chase’s Stat. 868. .As the law of that year, so far as it operated as a restraining act, was repealed the next year, it is unnecessary to examine it.
At the next session of the general assembly, a number of additional banks were incorporated, and on January 27, 1816, the act now in force, “ to prohibit the issuing and circulating unauthorized bank paper,” was passed. Chase’s Stat. 904. The first section of this act provides, “ That if any person within this state shall act as an officer, agent, trustee, or servant, to any bank or moneyed association coming within the description contained in section 2 of this act, except a bank incorporated by a law of this state, he *shall, for every such offense, forfeit and pay the sum of $1,000.
And section 2, “That every company or association, that shall, lend money, and shall issue, by their officer or officers, or, by any other person or persons, bonds, notes, or bills, payable to bearer, or, payable to order, and indorsed in blank, or use other shift or device, whereby the bonds, notes, or bills, given by such company, or association, or on their behalf, pass or circulate by delivery, shall be taken and deemed a bank within this act.”
“ Sec. 3. Every person who shall act as a president, cashier, clerk, or director to any such bank, or shall, in any respect, assist in discounting paper, or lending money for such bank, or in paying out and receiving money for such bank, or, in any manner, intermeddle with such bank, or its concerns, and every person, whose handwriting shall appear on the bond, bill, note, or contract of such bank, whether as a drawer thereof, or a payee and *69 indorser, shall be deemed and taken an officer of such bank, within the meaning of this act.”
From these sections, it will be seen that the leading object of the bill was to prevent unauthorized banking, and in this way, prevent the currency of bonds, notes, or bills, which had not been issued by responsible institutions, or by institutions recognized by law. Associations that “shall lend money, and shall, by their officers, issue bonds, notes, and bills,” are the associations prohibited. It has, by some, been contended that the word l‘and,” as here used, should, for the purpose of preventing the evil complained of, be held as having the same meaning as the word “ or but, at the time this act was passed, it was not supposed that any association would issue notes or bills, to pass and circulate as money f unless coupled with the design of loaning the same, and thus making a profit.
In the case now under consideration, the counsel for the plaintiff in error requested the court of common pleas to charge the jury that, if there was not an intention to do a banking business, he could not be found guilty. This instruction was not given. Had the law of 1816 been the only law *upon the subject, probably here would have been an error; but it had been found, that associations, which did not do a banking business, had adopted the practice of issuing notes and bills intended to circulate and pass as money. To remedy this evil, the general assembly, on March 18, 1839, passed an act to amend the before-recited act of January 27, 1816. Swan’s Stat. 140.
By section 1 of this amendatory act, it is provided: “ That every company or association, excepta bank incorporated by a law of this state, that shall lend notes, bonds, bills, checks, orders, certificates of deposit, or any other evidence of debt, and shall issue, by their officer or officers, agents, or any other person or persons, notes, bonds, bills, checks, orders, certificates of deposit, or other evidence of debt, payable to order, and indorsed in blank, or payable to bearer, designed, calculated, or intended to circulate as money; or shall issue, put in circulation, or pay out, for debts or property, with or without any such loan, any such notes, bonds, bills, checks, orders, certificates of deposit, or other evidence of debt, or use other shift or device, whereby any such notes, bills, bonds, checks, orders, certificates of deposit, or other evidence of debt so issued, put in circulation, or paid out by said company or associa *70 tion, or on their behalf, pass and circulate by delivery, shall be taken and deemed an unauthorized bank, within the meaning of the act to which this is an amendment, entitled ‘an act to prohibit the issuing and circulating of unauthorized bank paper,’ passed January 27, 1816.”
From the passage of this amendatory act, it must be considered, in connection with the law of 1816, as if it had actually constituted a part of that law, at the* time of its enactment, so far as relates to offenses committed subsequent to the passage of the amendatory law. Considering it in this light, there can be no doubt that an association violates the law by putting in circulation notes, bills, etc., intended to pass as money, whether accompanied with an intention of doing a banking business, or otherwise. Of course, it would have been improper for the court of common pleas to have given the instruction first requested.
*The court were next requested to instruct the jury, that, unless the notes were indorsed in blank, before they left the control of the company, the defendant could not be found guilty. This was refused by the court, or, rather, such instructions were not given, in so many words, although I incline to the opinion that-such instructions were, in substance, given, or such as were equivalent. If not so, the question arises, whether such instructions, given unconditionally, would have been proper. The bill of exceptions shows that these notes were payable to order; that they were, in similitude and appearance, like bank notes, and struck upon an engraved plate ; signed by the president and secretary of the company ; and that, when issued, it was intended, designed, and calculated by the defendant, and those who were concerned in paying them out, and putting them in circulation, that they should pass and circulate as money; and this, too, under an agreement and understanding, with those to whom the notes were paid by the company, that, so soon as they should receive them, they should indorse them in blank, and circulate them as money. It is apparent that the creditors of the company, to whom these notes wore paid, were as much concerned in this transaction as the canal company itself. They had a part to act in purchasing this paper for circulation, and this part was to indorse it. By such indorsement, they, as well as the officers of the company, made themselves liable to the penalty of the law, which provides that “every person, whose handwriting shall appear on *71 the bond, bill, not.e, or contract of such bank, whether as the drawer thereof, or witness, payee, or indorser, shall be taken, and deemed, an officer of such bank.” Under such circumstances, it is but a poor subterfuge to claim that the plaintiff in error was guiltless, because the indorsement was made after the instrument was paid out by the company. It is, at best, but a miserable “ shift or device,” by which to avoid the penalty of the law. In our opinion, tho court did not err in refusing to give tho unqualified instruction, as requested.
*Nor do we see any error in the instructions actually given. Surely, it was proper for the court to say to the jury, that the defendant could not excuse himself from liability, for an illegal act, on the ground that the ulterior object in view was a good one. Nor was it improper to instruct the jury, that if the defendant had made use of “shifts and devices,” to procure for the paper issued a circulation as money, he was guilty, although the paper was not payable to bearer, or indorsed before it left the control of tho company. Whether such “shifts and devices” had been used, was a question of fact for the jury to determine.
The record shows that the court of common pleas, in addition to the assessment of a fine, sentenced the plaintiff in error to stand committed, until the fine and costs should be paid. This part of the sentence, according to the decision of this court, in the case of Lougee against the state, already referred to, is erroneous ; and, so far, the judgment of the court of common pleas is reversed. So far as respects the fine and costs, the judgment of that court is affirmed. Judgment accordingly.